1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DONALD R. MORRIS, JR.,

              Plaintiff,

     v.

JO ANNE B. BARNHART, Commissioner of
Social Security,

              Defendant.

CASE NO.    C04-5689FDB

REPORT AND
RECOMMENDATION

Noted for December 2, 2005

Plaintiff, Donald R. Morris, Jr., has brought this matter for judicial review of the denial of his application for supplemental security income ("SSI") benefits.  This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After reviewing the parties' briefs and the remaining record, the undersigned submits the following report and recommendation for the Honorable Franklin D. Burgess' review.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is thirty-five years old.[1] Tr. 214.  He has a tenth grade education and past work experience as a playground supervisor and bus monitor for a school district, supervisor, unloading worker for a shipping firm, construction helper, cleaner, and packing worker. Tr. 22-23, 302, 337.

---

[1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

Plaintiff filed applications for SSI benefits in 1992, 1996 and 2001, all of which were denied by the Commissioner. Tr. 16, 38-42, 202-05, 208-212.  Plaintiff filed his present application for SSI benefits on February 13, 2002, alleging disability as of July 1, 2001, due to asthma, eczema, anxiety, depression, and a learning disorder. Tr. 214-17, 312.  His application was denied initially and on reconsideration. Tr. 146, 152.  Plaintiff requested a hearing, which was held on February 2, 2004, before an administrative law judge ("ALJ"). Tr. 467.  At the hearing, plaintiff, represented by counsel, appeared and testified, as did a medical expert and a vocational expert. Tr. 467-511.

On April 17, 2004, the ALJ issued a decision determining plaintiff to be not disabled, finding in relevant part as follows:

(1)    at step one of the disability evaluation process, plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability;

(2)    at step two, plaintiff had "severe" impairments consisting of chronic eczema, asthma, an anxiety disorder, a depressive disorder, and a substance abuse disorder;

(3)    at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; and

(4)    at step four, plaintiff had the residual functional capacity to perform a modified range of light work, which did not preclude him from performing his past relevant work.

Tr. 23-24.  Plaintiff's request for review was denied by the Appeals Council on August 18, 2004, making the ALJ's decision the Commissioner's final decision. Tr. 8; 20 C.F.R. § 416.1481.

On October 15, 2004, plaintiff filed a complaint in this court seeking review of the ALJ's decision. (Dkt. #1).  Specifically, plaintiff argues that decision should be reversed for an award of benefits for the following reasons:

(a)    the ALJ erred in not finding plaintiff's low intelligence level to be a "severe" impairment;

(b)    the ALJ erred in not finding plaintiff's diagnosis of mental retardation met or equaled the criteria for that impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05(C);

(c)    the ALJ erred in finding plaintiff capable of performing his past relevant work; and

(d)    plaintiff's mental impairments prohibit him from performing other jobs existing in significant numbers in the national economy.

While the undersigned agrees that the ALJ erred in finding plaintiff not disabled, for the reasons set forth

below, this matter should be remanded for further administrative proceedings.

<u>DISCUSSION</u>

This court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Fife v. Heckler</u>, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); <u>Carr v. Sullivan</u>, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the court must uphold the Commissioner's decision. <u>Allen v. Heckler</u>, 749 F.2d 577, 579 (9th Cir. 1984).

I.    <u>The ALJ Did Not Err in Declining to Find Plaintiff's Low IQ Scores Amounted to a Severe Impairment</u>

To determine whether a claimant is entitled to disability benefits, the ALJ engages in a five-step sequential evaluation process. 20 C.F.R. § 416.920. At step two, the ALJ must determine if an impairment is "severe". <u>Id.</u> An impairment is "not severe" if it does not "significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. §§ 416.920(a), 416.1520( c); Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1. Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b); SSR 85- 28, 1985 WL 56856 *3.

An impairment is not severe only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual[']s ability to work." <u>See</u> SSR 85-28, 1985 WL 56856 *3; <u>Smolen v. Chater</u>, 80 F.3d 1273, 1290 (9th Cir. 1996); <u>Yuckert v. Bowen</u>, 841 F.2d 303, 306 (9th Cir.1988). Plaintiff has the burden of proving that his "impairments or their symptoms affect his ability to perform basic work activities." <u>Edlund v. Massanari</u>, 253 F.3d 1152, 1159-60 (9th Cir. 2001); <u>Tidwell v. Apfel</u>, 161 F.3d 599, 601 (9th Cir. 1998). The step two inquiry described above, however, is a *de minimis* screening device used to dispose of groundless claims. <u>Smolen</u>, 80 F.3d at 1290.

Barbara Dahl, Ph.D., who evaluated plaintiff in early July 2003, found his IQ testing placed him "in the mildly mentally retarded range." Tr. 458. Dr. Dahl opined that "[b]ased on his intellectual abilities," plaintiff was "not likely to benefit from a formalized training program," particularly if he needed "to listen

attentively or to read." <u>Id.</u>  She felt he would be "more likely to succeed" if he was "taught simple, routine tasks in a hands-on manner." <u>Id.</u>  Dr. Dahl further opined that plaintiff "would not be able to adequately read and interpret instructions as they are usually presented in a classroom setting," but that he "could interpret very simple visual instructions." <u>Id.</u>

Kathleen S. Mayers, Ph.D., who examined plaintiff in mid-November 2003, found plaintiff's verbal IQ and verbal comprehension index scores to be in the "borderline retarded range," and his performance and full scale IQ scores to be in the "mildly retarded range." Tr. 441.  She felt he was a "low functioning individual with few areas of intellectual strength," and found his "ability to maintain employment and adapt to a work-like environment" to be "decreased by his IQ in the mildly retarded range," as well as by his eczema. <u>Id.</u>  Dr. Mayers further found plaintiff to be incapable of managing his own funds "because of his very poor math skills." Tr. 443.

Plaintiff argues the ALJ erred in failing to find his low IQ scores amounted to a severe impairment. Assuming that the IQ scores obtained by Drs. Dahl and Mayers were in fact valid, plaintiff would appear to be correct.  As noted above, both examining psychologists found that because of his low IQ scores, he had significant mental functional impairments that more than minimally affected his ability to work.  As explained below, however, the ALJ did not err in finding those scores to be invalid.  Accordingly, the ALJ also did not err in declining to find plaintiff's low IQ scores amounted to a severe impairment.

II.     <u>The ALJ Properly Found Plaintiff's Diagnosed Mental Retardation Did Not Meet or Equal the Criteria for that Impairment Listed in the Commissioner's Regulations</u>

At step three of the disability evaluation process, the ALJ must evaluate the claimant's impairments to see if they meet or equal any of the impairments listed in 20 C.F. R. Part 404, Subpart P, Appendix 1 (the "Listings"). 20 C.F.R § 416.920(d); <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999).  If any of the claimant's impairments meet or equal a listed impairment, he or she is deemed disabled. <u>Id.</u>  The burden of proof is on the claimant to establish he or she meets or equals any of the impairments in the Listings. <u>Tacket</u>, 180 F.3d at 1098.

A mental or physical impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.908.  It must be established by medical evidence "consisting of signs, symptoms, and laboratory findings." <u>Id.</u>  An impairment meets a listed impairment "only when it manifests the specific

findings described in the set of medical criteria for that listed impairment." SSR 83-19, 1983 WL 31248 *2.
An impairment equals a listed impairment "only if the medical findings (defined as a set of symptoms, signs, and laboratory findings) are at least equivalent in severity to the set of medical findings for the listed impairment." Id. at *2.  However, "symptoms alone" will not justify a finding of equivalence. Id.

> A.   Listing 12.05(C) Criteria

Plaintiff argues he meets or equals the criteria for presumptive disability under 20 C.F.R. Part 404, Subpart A, Appendix 1, § 12.05(C) ("Listing 12.05(C)").  Listing 12.05(C) reads in relevant part:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . .

To meet the first criteria of Listing 12.05(C), the claimant's IQ score must be "valid." Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999).  The medical and other evidence in the record can "cast doubt on the validity" of that score. Id.  With respect to the second criteria, the ALJ assesses "the degree of functional limitation" the additional impairment imposes to determine if it "significantly limits" the claimant's "physical or mental ability to do basic work activities," i.e., if the impairment is "severe" as defined in 20 C.F.R. § 416.920(c). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A).

In addition to the above two criteria, the claimant must demonstrate his impairment "satisfies the diagnostic description" for Listing 12.05 contained in the explanatory material for mental disorders under 20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.00. See Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A)).  The Commissioner's regulations state specifically that:

> Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation.  It also contains four sets of criteria (paragraphs A through D).  If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A) (emphasis added).  Therefore, to be found disabled under Listing 12.05(C), plaintiff also must show he had "significantly subaverage general intellectual functioning

with deficits in adaptive functioning initially manifested" prior to age 22. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C).

Plaintiff argues he is not required to present evidence of deficits in adaptive functioning before age 22, because he has presented evidence of IQ scores in the range of 60 through 70 after age 22.  To support this argument, plaintiff relies on decisions from several circuit courts holding that "absent evidence of sudden trauma that can cause retardation," IQ scores in the range of 60 through 70 obtained after age 22 "create a rebuttable presumption of a fairly constant IQ throughout" a claimant's life. Hodges v. Barnhart, 276 F.3d 1265, 1268-69 (11th Cir. 2001)[2]; Muncy v. Apfel, 247 F.3d 278, 734-35 (8th Cir. 2001); Luckey v. U.S. Dept. of Health & Human Servs., 890 F.2d 666, 668-69 (4th Cir. 1989).

Other circuit courts, however, have not adopted this presumption. See Foster, 279 F.3d at 354-55; Maggard, 167 F.3d at 380.  As the Sixth Circuit noted, amendments made to the regulations "clarify that a claimant will meet the listing for mental retardation only '[i]f [the claimant's] impairment satisfies the diagnostic description in the introductory paragraph *and* any one of the four sets of criteria." Foster, 279 F.3d at 354 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A) *as amended by* 65 Fed.Reg. 50746, 50776 (August 21, 2000)) (emphasis added by court of appeals).[3]

Those circuits that have adopted the above presumption, allow the ALJ to consider evidence in the record to rebut that presumption, including evidence that calls into question the validity of the claimant's IQ scores. See Hodges, 276 F.3d at 1268-69; Muncy, 247 F.3d at 734-35; Luckey, 890 F.2d at 668-69. Indeed, the Commissioner herself has stated that a diagnosis of mental retardation prior to age 22 is inferred only "*when the longitudinal history and evidence of current functioning demonstrate that the impairment existed before the development period.*" Hodges, 276 F.3d at 1269 (quoting 65 FR 50746, 50772 (August

---

[2] In so holding, the Eleventh Circuit looked to the Commissioner's statement that: "the significantly subaverage general intellectual functioning with deficits in adaptive behavior must have been initially 'manifested' during the developmental period. *We have always interpreted this word to include the common clinical practice of inferring a diagnosis of mental retardation when the longitudinal history and evidence of current functioning demonstrate that the impairment existed before the developmental period.*" Id. at 1269 (quoting 65 FR 50746, 50772 (August 20, 2000)) (emphasis added by court of appeals).

[3] The only Ninth Circuit decision concerning this issue is Fanning v. Bowen, 827 F.2d 631 (9th Cir. 1987).  In Fanning, the Court of Appeals found that because the claimant in that case had an IQ of 69, "[t]he determinative issue" was whether he suffered "from a physical or other mental impairment which imposes an additional and significant work-related limitation of function." Id. at 633.  The Ninth Circuit, however, decided Fanning based on a much older version of Listing 12.05(C). See Id. (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C) (1986)).  Further, the Court of Appeals did not discuss whether it would adopt the presumption adopted by the Eleventh, Eighth and Fourth Circuits, or whether it would follow the lead of the Sixth and Seventh Circuits.  It thus appears that this issue has not yet been decided in this circuit.

30, 2000) (emphasis added by court of appeals).  Those courts that have not adopted the presumption also will uphold an ALJ's finding that a claimant's mental impairment did not initially manifest prior to age 22, if that finding is supported by substantial evidence.  Foster, 279 F.3d 354-55; Maggard, 167 F.3d at 380.  In terms of evaluating the sufficiency of the evidence in the record regarding diagnoses of mental retardation, therefore, both approaches appear to be fairly similar.

Regardless of whether or not the presumption of a fairly constant IQ score applies in this circuit, plaintiff has failed to establish he meets or equals the criteria of Listing 12.05(C) under either approach. The ALJ provided the following reasons for why he found plaintiff did not satisfy the criteria of Listing 12.05(C):

> These reports [of Dr. Dahl and Dr. Mayers] are consistent with disability.  Indeed, the claimant's IQ tests suggest that his retardation meets the criteria of section 12.05C or D. However, the diagnosis of mental retardation as noted in listing 12.05C, was a bit equivocal.  The claimant has worked in the past, and he has had a driver's license as well; his [sic] lost his license due to driving offenses.  He was able to hold down jobs in the past, and reported that he left these jobs because of difficulty getting along with co-workers, not because of intellectual problems (exhibit 16D).  He clearly functions much better than his tested IQ levels would indicate.  In addition, the claimant has not shown significant loss of functioning prior to age 22; he said that he left school in his early years because he moved and he wanted to go to work, not because of retardation (exhibit 16F:1).

> Further, at the hearing a medical expert, Bruce Olson, Ph.D., reviewed the evidence and attended the claimant's testimony.  He opined that the claimant had no psychiatric basis for an impairment other than substance abuse.  He did not find that the evidence substantiated mental retardation.  In his opinion the IQ tests were questionable because they lacked the necessary validity measures.  The raw scores of the claimant's IQ tests were not in the file and therefore he was unable to evaluate them.  He also stated that the claimant's presentation was not consistent with a person have [sic] such low IQ scores.  Further, the testing by Dr. Mayers may well have been negatively influenced by motivational factors, or the claimant's intoxication at the time.

> It is also noted that Dr. Dahl felt the claimant's eczema and other impairments may have contributed to his low scores, and at her examination his mental status functioning was fairly intact (exhibit 16F).  Dr. Dahl agreed that the claimant had a depressive disorder NOS and anxiety disorder NOS, but these conditions were primarily related to his substance abuse disorder.  The claimant's mental impairments did not meet or equal a listing.  All in all, the IQ scores are not determinative of this part of the assessment.

Tr. 20.

There is no dispute that plaintiff has a physical or other mental impairment imposing an additional and significant work-related limitation of function.  As noted above, at step two of the disability evaluation process, the ALJ found that plaintiff's chronic eczema, asthma, anxiety disorder, depressive disorder, and substance abuse disorder, were all severe impairments. Tr. 23.  As such, plaintiff has met the second of the

1  two criteria set forth in Listing 12.05(C).  The remaining issues thus are whether plaintiff has established he

2  has a valid IQ score of 60 through 70 and, if so, whether by presumption or through other evidence, he has

3  shown significantly subaverage general intellectual functioning with deficits in adaptive functioning initially

4  manifested prior to age 22.

5          B.       The Medical Evidence in the Record Regarding Plaintiff's Intelligence Level

6          The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

7  medical evidence.  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in the

8  record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the

9  ALJ.  Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must

10 be upheld."  Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir.

11 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact

12 inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts

13 "falls within this responsibility."  Id. at 603.

14         In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

15 supported by specific, cogent reasons."  Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a

16 detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

17 thereof, and making findings."  Id.  The ALJ also may draw inferences "logically flowing from the evidence."

18 Sample, 694 F.2d at 642.  Further, the court itself may draw "specific and legitimate inferences from the

19 ALJ's opinion."  Magallanes v. Bowen, 881 F.2d 747, 755 (9th Cir. 1989).

20         The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

21 either a treating or examining physician.  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

22 treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and

23 legitimate reasons that are supported by substantial evidence in the record."  Id. at 830-31.  However, the

24 ALJ "need not discuss all evidence presented" to him or her.  Vincent on Behalf of Vincent v. Heckler, 739

25 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in the original).  The ALJ must only explain

26 why "significant probative evidence has been rejected."  Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07

27 (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

28         In general, more weight is given to a treating physician's opinion than to the opinions of those who

1  do not treat the claimant. <u>Lester</u>, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

2  a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings."

3  <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th

4  Cir. 2001); <u>Magallanes</u>, 881 F.2d at 75.  An examining physician's opinion is "entitled to greater weight

5  than the opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31.  A nonexamining physician's

6  opinion may constitute substantial evidence if "it is consistent with other independent evidence in the

7  record." <u>Id.</u> at 830-31; <u>Tonapetyan</u>, 242 F.3d at 1149.

8          Plaintiff takes issue with the ALJ's determination that the IQ scores obtained by Dr. Dahl and Dr.

9  Mayers are not valid.  The undersigned, however, finds the ALJ's determination on this issue is supported

10  by substantial evidence.  Test results obtained by Dr. Dahl showed plaintiff's full scale IQ score to be 64, his

11  performance IQ score to be 64, and his verbal IQ score to be 69. Tr. 456-57.  Dr. Dahl though noted that

12  plaintiff reported that his eczema kept him awake at night and that he had not had any sleep prior to the

13  testing. Tr. 458.  These factors, she stated, "could have negatively impacted his scores." <u>Id.</u>  The ALJ

14  pointed to this statement as one of the reasons for discounting the testing's validity. Tr. 20.  Thus, although

15  plaintiff asserts Dr. Dahl felt the scores she obtained were valid, she did not specifically say so, and, at the

16  very least, the above statement would tend to belie that assertion.  Further, as noted by the ALJ, plaintiff's

17  mental status functioning during the evaluation was fairly intact. Tr. 20, 456.

18          Testing administered by Dr. Mayers resulted in a full scale IQ score of 67, a performance IQ score

19  of 68, and a verbal IQ score of 72. Tr. 441.  With respect to these scores, the ALJ stated that Dr. Mayers

20  testing "may well have been negatively influenced by motivational factors" or plaintiff's "intoxication at the

21  time." Tr. 20.  It is true that Dr. Mayers stated plaintiff's testing results suggested he "was truthful and

22  made a good effort," and that she viewed those results as "generally valid and reliable." Tr. 442.  However,

23  she also noted that during the evaluation he "had a manner that suggested that he was sedated." Tr. 438.  In

24  conjunction with the fact that plaintiff was observed to be "moderately intoxicated" with "a strong alcohol

25  odor on his breath" the day before during a physical evaluation (Tr. 447, 450), it was not unreasonable for

26  the ALJ to presume he continued to remain, or again was, under the influence of alcohol during the testing

27  administered by Dr. Mayers the following day.

28          In addition, Dr. Mayers made the following observations regarding plaintiff's general attitude and

1  behavior concerning the testing:

2  > He was permitted to take the MMPI-2 home because of transportation problems and he repeatedly made promises to return it promptly. It was necessary for this evaluator to
3  > called [sic] him repeatedly and he continually made specific promises about when he would bring the completed test back. This happened over six times. When he failed to
4  > bring the test back, he would not call and explain the problem. Eventually, I talked with someone who said she was his sister; this woman promised to mail the test after if [sic]
5  > he repeatedly failed to contact this evaluator or return the test.

6  Tr. 438-39. As such, it was not unreasonable for the ALJ to find the testing administered by Dr. Mayers

7  may have been negatively influenced by motivational factors as well.

8    The ALJ also relied on the testimony of Dr. Olson to further discount the validity of the test results

9  obtained by Dr. Dahl and Dr. Mayers. Tr. 20. Dr. Olson testified that he found no substantiation of mental

10  retardation in the record and that the tests administered by Drs. Dahl and Mayers were questionable because

11  those results lacked the necessary validity measures, because of evidence in the record of plaintiff's use of

12  alcohol during testing, because of evidence in the record of plaintiff's misrepresentation regarding his use of

13  drugs and alcohol, and because plaintiff's presentation at the hearing was not consistent with an individual

14  who had such low scores. Tr. 501-07.

15    In terms of substantiation in the record of mental retardation, first it must be noted that other than

16  Dr. Dahl and Dr. Mayers, no other medical source in the record have found evidence of mental retardation.

17  See Tr. 65, 127-30, 383, 385, 426. In addition, Bruce A. Eather, Ph.D., who evaluated plaintiff in mid-

18  October 2001, diagnosed a learning disorder. Tr. 298. He based this diagnosis, however, solely on

19  plaintiff's own reported history. Id.

20    With respect to Dr. Olson's testimony, plaintiff argues it is not reliable because Dr. Olson did not

21  conduct any evaluation of his own. Dr. Olson, however, was present at the hearing. While that hearing

22  may have lasted for only a limited time, Dr. Olson did have the opportunity to personally observe plaintiff.

23  See Sanchez v. Apfel, 85 F. Supp.2d 986, 992 (C.D. Cal. 2000) (clinical and laboratory data may consist of

24  diagnoses and observations of professionals trained in field of psychopathology); Sprague v. Bowen, 812

25  F.2d 1226, 1232 (9th Cir. 1987) (opinion based on clinical observations supporting diagnosis of depression

26  is competent evidence). Further, the reasonableness of the amount of time spent personally observing the

27  behavior of plaintiff is a question that goes to the credibility of Dr. Olson's opinion, a question solely

28  reserved to the ALJ. Reddick, 157 F.3d at 725; Sample, 694 F.2d at 642.

Plaintiff further argues Dr. Olson's testimony is unreliable, because he never conducted his own IQ testing. Dr. Olson, however, is a medical expert in the area of psychopathology, and as such is qualified to comment on the validity of the testing administered by Drs. Dahl and Mayers. Based on his review of the record, Dr. Olson testified that their test results lacked the "validity indices" that in his opinion are needed to establish their reliability. Tr. 503. Dr. Olson, furthermore, noted that some of the testing conducted by Dr. Mayers was deemed to be invalid due to plaintiff's exaggeration. Tr. 442, 502. While Dr. Mayers did state she felt plaintiff was truthful and made a good effort, she also admitted he "managed to invalidate" that testing "by acknowledging so many unusual experiences, feelings and attitudes." Tr. 442.

As discussed above, the ALJ did not err in finding that the IQ scores obtained by Dr. Mayers were invalid in part due to plaintiff's intoxication at the time. Dr. Olson also pointed to evidence in the record indicating that plaintiff was not entirely truthful regarding his drug and alcohol use. Tr. 502. For example, while plaintiff told Dr. Dahl that he had "a long history" of substance abuse from age 14 to age 25, he told Dr. Mayers that he had "never used street drugs." Tr. 437, 455. In addition, while plaintiff told Dr. Mayers that he did not believe he currently had any problem with alcohol abuse, he "had a manner that suggested that he was sedated" at the time of testing, and the day before he was noted to be "moderately intoxicated" with a "strong odor of alcohol on his breath" during a physical examination. Tr. 437, 447.

Lastly, also as discussed above, the ALJ may consider medical and other evidence in the record to show plaintiff has not established significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested prior to age 22, or, in those circuits that recognize it, to rebut the presumption of a fairly constant IQ score throughout plaintiff's life. Here, the ALJ noted that plaintiff had been able to hold down jobs in the past, that he left those jobs because of difficulty getting along with co-workers rather than intellectual problems, and that he lost his driver's license because of driving offenses and left school because he moved and wanted to go to work, again, rather than because of problems with mental retardation. Tr. 20. While it is true plaintiff was noted to have poor math and reading skills, those findings were based on the test results obtained by Dr. Dahl and Dr. Mayers, which the ALJ properly found to be invalid. Tr. 440, 442, 457. Further, the mere fact that a claimant may have attended special education classes is not in itself an indication of mental retardation.

Plaintiff argues there is no evidence in the record to demonstrate that he ever functioned at a higher

intellectual level than was shown by the test results obtained by Drs. Dahl and Mayers.  In addition to the evidence discussed in the previous paragraph, however, the record does contain a psychological evaluation from early May 1993, only a month after plaintiff's twenty-third birthday, in which plaintiff was found to have a verbal IQ score of 86, a performance IQ score of 71, and a full scale IQ score of 78, all of which were outside the 60 through 70 range required by Listing 12.05(C). Tr. 130.  Plaintiff was found to have no mental impairment at the time of the evaluation. Tr. 128.  While not mentioned by the ALJ in his step three analysis, that evaluation is further evidence that plaintiff was functioning at a higher level than indicated by the scores obtained by Dr. Dahl and Dr. Mayers.

III.    The ALJ Erred in Assessing Plaintiff's Residual Functional Capacity

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A claimant's residual functional capacity assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. Id. Residual functional capacity thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

Here, the ALJ assessed plaintiff with the following residual functional capacity:

> [T]he claimant retains the residual functional capacity to perform light work. . . . He can sit and stand/walk for 6 hours each in an 8-hour workday.  He can occasionally climb stairs but not ladders, ropes or scaffolds.  He should avoid exposure to fumes, dust, smoke, heights and hazards, harsh chemicals, and direct sunlight.  He can perform simple, repetitive tasks and should have no public contact.

Tr. 22.  For the reasons set forth below, the undersigned finds the ALJ's assessment of plaintiff's residual functional capacity is not supported by the substantial evidence in the record.  Specifically, the ALJ failed to

properly consider all of plaintiff's mental functional limitations.

      A.   Plaintiff's Eczema and Asthma

Plaintiff argues the ALJ erred in not including in the above residual functional capacity assessment any other limitations stemming from his eczema and asthma.  With respect to those two impairments, the ALJ found as follows:

> Reviewing the record as a whole, the claimant has a documented problem with eczema, but no one has opined that he cannot work because of it.  There is no evidence that his skin condition is so severe or lasted for so long that it would impede employment.  Basically, he has to avoid the use of strong detergents and environmental chemicals.  He testified that his condition is worse than that, but his credibility is lacking, as discussed in this section.  He also stated that his asthma is disabling, but there are no hospitalizations or emergency room visits with asthma problems.  He is using only inhalers and he does not use a home nebulizer.  The file does not contain any evidence of severe exacerbations of asthma that would reach a disabling level.

Tr. 21.

The substantial evidence in the record supports the ALJ's findings regarding plaintiff's eczema and asthma (except that it appears plaintiff did visit the emergency room on a few occasions due to complaints from those impairments), and the limitations resulting from those impairments the ALJ chose to include in plaintiff's residual functional capacity assessment. See Tr. 395-96, 380-82, 389-91, 393-94, 405, 407, 410-17, 446-53.  Accordingly, the ALJ did not err in assessing plaintiff's residual functional capacity, at least with respect to plaintiff's physical impairments.

      B.   Plaintiff's Mental Functional Limitations

Plaintiff argues the ALJ erred in evaluating the medical evidence in the record regarding his mental functional limitations, which he asserts prohibit him from performing all work.  Although the undersigned agrees the ALJ erred in evaluating that evidence, at least with respect to plaintiff's anxiety and depression, it is far from clear that plaintiff is precluded from all work, or even his past relevant work.  First, regarding plaintiff's alleged mental retardation, as discussed above, the ALJ did not err in finding the low IQ scores obtained by Dr. Dahl and Dr. Mayers to be invalid.  As the mental functional limitations they found were based for the most part on the psychological testing they administered (Tr. 440-43, 456-58), the substantial evidence in the record does not support inclusion of those limitations in the ALJ's assessment of plaintiff's residual functional capacity.

It is true that Dr. Dahl assessed plaintiff as having an adjustment disorder with chronic anxiety. Tr.

457.  The mental functional limitations he was found to have, however, all related to his low level of intellectual functioning. Tr. 458.  Similarly, while Dr. Mayers found plaintiff had a fair to poor ability to perform in a number of mental functional areas (Tr. 444-45), those limitations again were premised largely on her finding that he functioned "at a low level intellectually." Tr. 443.  It also is true that Dr. Mayers did diagnose plaintiff with depression related to his eczema. Tr. 442.  However, with respect to his reported mood and observed affect during the evaluation, plaintiff stated that he was just "a little bit depressed," and he denied having any problems with anxiety or panic attacks. Tr. 439.

On the other hand, the record does contain a psychologic/psychiatric evaluation form completed by Bruce Eather, Ph.D., in mid-October 2001.  Dr. Eather diagnosed plaintiff with an anxiety disorder, an adjustment disorder with depressed mood, psychological factors affecting eczema, and a learning disorder by history. Tr. 398.  Dr. Eather found plaintiff severely impaired in his ability to relate appropriately to co-workers and supervisors, and markedly impaired in his ability to interact appropriately in public contacts and respond appropriately to and tolerate the pressures and expectations of a normal work setting. Tr. 399.  Dr. Eather further found plaintiff moderately impaired in his ability to understand, remember and follow complex instructions, exercise judgment and make decisions, control his physical and motor movements, and maintain appropriate behavior. Tr. 399.

The ALJ evaluated Dr. Eather's evaluation of plaintiff as follows:

> The doctor's report is given careful consideration, but it was entered on a check-box form, and for that reason alone is not entitled to much weight without further explanation. . . . Here, Dr. Eather mentioned the results of mental status testing that went into his determination, but this was apparently only a one-time, brief examination. Further, it is inconsistent with the testimony of the medical expert at the hearing, who had access to the entire file.  Dr. Eather's report is given little weight, although his observation that the claimant had difficulty working with others and performing detailed tasks is given some weight.

Tr. 19.  It is true that the Ninth Circuit has expressed preference for individualized medical opinions over "check-off" reports. See Murray v. Heckler, 722 F.2d 499, 501 (9th Cir.1983).  Here, however, Dr. Eather performed his own evaluation of plaintiff, and included on the evaluation form his clinical observations and other diagnostic notes. Tr. 397-400.  Accordingly, the undersigned does not find the evaluation form completed by Dr. Eather to be the kind of check-off report disfavored in this circuit.  Indeed, the court has on many occasions upheld the Commissioner's decisions based at least in part on the written evaluations set forth on such standardized forms.

REPORT AND RECOMMENDATION
Page - 14

1   The ALJ also characterized Dr. Eather's evaluation of plaintiff as a "one-time, brief examination."

2   Tr. 19.  However, it is not at all clear from the record that the evaluation conducted by Dr. Eather was of

3   any less duration than those of other examining medical sources in the record.  Further, while Dr. Eather's

4   evaluation may be inconsistent with the testimony of Dr. Olson, in general, Dr. Eather's opinion is entitled

5   to greater weight than that of Dr. Olson. Lester, 81 F.3d at 830-31.  A nonexamining physician's opinion

6   may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at

7   830-31; Tonapetyan, 242 F.3d at 1149.  Here, however, Dr. Olson's opinion that there is no psychological

8   basis for an impairment other than that of alcohol and drug abuse (Tr. 501) is inconsistent with the record as

9   a whole and with the ALJ's own findings.

10   As noted above, Dr. Dahl diagnosed plaintiff with an adjustment disorder with chronic anxiety. Tr.

11   457.  While plaintiff reported being only "a little bit depressed" at the time of his evaluation, Dr. Mayers did

12   diagnose him with depression related to his eczema. Tr. 439, 442.  In addition, although one of the non-

13   examining consulting physicians found plaintiff had no mental impairment due to insufficient evidence (Tr.

14   383, 385), Dr. Carla van Dam, the other non-examining consulting physician in the record, diagnosed him

15   with an anxiety disorder and adjustment disorder with depressed mood. Tr. 425, 427.  Thus, the weight of

16   the evidence in the record indicates that plaintiff has both an anxiety and a depressive disorder.  Indeed, the

17   ALJ himself found those disorder to be "severe" impairments. Tr. 18.

18   In addition, the ALJ did not explain why he gave Dr. Eather's opinion regarding plaintiff's ability to

19   work with others and perform detailed tasks "some weight," but only "little weight" to the other mental

20   functional limitations found by Dr. Eather. Tr. 19.  The ALJ also found Dr. van Dam's report to be

21   consistent, at least to some extent, with the medical evidence in the record. Tr. 22.  The ALJ therefore gave

22   her opinion "some weight" and adopted the limitations she found concerning the ability to perform detailed

23   tasks and interact with the public. Tr. 22, 418-19.  However, the ALJ did not provide any explanation as to

24   why he did not adopt the other many moderate mental functional limitations found by Dr. van Dam. Tr.

25   418-21, 432.  As such, the ALJ erred.

26   IV.   The Vocational Expert's Testimony

27   An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

28   posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence.  Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).  Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record."  Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from that description those limitations he finds do not exist.  Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (because ALJ included all limitations that he found to exist, and those findings were supported by substantial evidence, ALJ did not err in omitting other limitations claimant failed to prove).

The two hypothetical questions the ALJ posed to the vocational expert contain essentially the same limitations as those in his assessment of plaintiff's residual functional capacity, except that the vocational expert was told that plaintiff should have "limited" rather than "no" contact with the public.  Tr. 508-09.  This discrepancy alone tends to call the accuracy of the hypothetical questions into question.  As discussed above, furthermore, the ALJ failed to provide adequate explanations as to why he did not adopt all of the mental functional limitations found by Drs. Eather and van Dam.  As such, it is not clear that the record supports the description of plaintiff's limitations the ALJ provided to the vocational expert.  The testimony of the vocational expert, therefore, cannot be said to be entirely reliable.

V.      This Case Should Be Remanded for Further Administrative Proceedings

The court may remand a case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292.  Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Id.; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because issues still remain as to plaintiff's residual functional capacity assessment and as to whether he is capable of performing his past relevant work, this matter should be remanded to the Commissioner for further administrative proceedings.  If, on remand, the Commissioner determines that plaintiff is not able to return to his past relevant work, the Commissioner also shall determine whether plaintiff is capable of performing other work existing in significant numbers in the national economy.

REPORT AND RECOMMENDATION
Page - 16

1

CONCLUSION

2        Based on the foregoing discussion, the court should find the ALJ improperly concluded plaintiff was

3  not disabled, and should remand this matter to the Commissioner for further administrative proceedings.

4        Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b),

5  the parties shall have ten (10) days from service of this Report and Recommendation to file written

6  objections thereto. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those

7  objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit

8  imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **December 2,**

9  **2005**, as noted in the caption.

10        DATED this 4th day of November, 2005.

11

12

13

14                                        Karen L. Strombom
                                          United States Magistrate Judge
15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPORT AND RECOMMENDATION
Page - 17